UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRYAN STANLEY,

      **Plaintiff,**

      v.

HISTORIC NEWARK BASKET, LLC,

      **Defendant.**

Case No. 2:22-cv-1783
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Defendant Historic Newark Basket, LLC's Motion for Reconsideration (HNB Mot., ECF No. 35), supplemental brief in support of reconsideration (HNB Suppl. Br., ECF No. 50), Plaintiff Bryan Stanley's supplemental brief opposing reconsideration (Stanley Suppl. Br., ECF No. 48), and Stanley's Motion to Continue Trial Date (ECF No. 47). For the reasons stated herein, the Court **GRANTS** HNB's Motion (ECF No. 35) and **DENIES as moot** Stanley's Motion (ECF No. 47).

## BACKGROUND

This case concerns the failed real estate transaction involving the historic Longaberger Basket Building (the "Property"). The Court summarized the facts in its summary judgment Order (ECF No. 33), but further discussion is warranted here because the documents attached to HNB's supplemental briefing present new facts.

**I.**     **Factual Background**

    **A.**     **Prior Failed Attempts to Close and Source of Financing**

On November 14, 2021, The Arab Investment Company S.A.A. ("TAIC") approved "The Basket, Inc." for a $10,000,000.00 loan. (ECF No. 50-1, at PageID # 582.) The Basket, Inc. is an

1

Ohio corporation, and Stanley states it has two shareholders: Michael Heckmann is the majority shareholder, and Bryan Stanley is the minority shareholder. (ECF No. 50-9, at PageID # 624; ECF No. 50-12, at PageID # 660.)

The Parties were scheduled to close on December 16, 2021. On December 13, Stanley informed his real estate agent and HNB that the broker representing TAIC was in the intensive care unit ("ICU") suffering from the coronavirus. (ECF No. 50-2, at PageID # 593.) Because the broker, Thomas Ungrady, was in the ICU, Stanley could not speak with him. Stanley said he spoke with Mr. Ungrady's wife on the phone, and she confirmed that Mr. Ungrady did not have a phone in the ICU and, therefore, Stanley could not speak with him. (*Id.*) Thus, Stanley intended to communicate directly with the lender. (*Id.*)

On December 14, Stanley updated HNB that Mr. Ungrady was still in the ICU, that Stanley could not speak with him, and that Mr. Ungrady was the only agent for TAIC in the United States. (*Id.* at PageID # 591.) Stanley predicted that closing would not occur on December 16, and that the lender would be "looking at other options to move the money." (*Id.*)

On December 15, HNB's agent contacted Stanley's real estate agent and offered to extend the closing date 15 days if the Stanley would send HNB a non-refundable deposit of $100,000.00 to be applied at closing. (*Id.* at PageID # 589.) On December 16, Stanley's agent stated that Stanley was willing to give a $50,000.00 non-refundable deposit for the 15-day extension. (*Id.* at PageID # 586–87.)[1] On December 17, HNB agreed to give Stanley until December 31 to close the deal and asked whether there was an update on Mr. Ungrady or a plan to replace him if he was still ill. (*Id.* at PageID # 585–86.)

---

[1] Stanley paid this $50,000.00 earnest money. (Declaration of Bryan Stanley, ECF No. 27-1, at ¶ 5.)

On December 21, Stanley's agent informed HNB that the broker was still in the hospital. (*Id.* at PageID # 583.) The Parties did not close by December 31, 2021.

On January 3, 2022, Stanley's agent informed HNB that Stanley and his business partner secured a new investor to fund their purchase of the Property. (ECF No. 50-4, at PageID # 602–06.) This investor appears to be Quickline Capital Partners, Inc. (*Id.*) In an approval letter dated December 31, 2021, Stanley's business partner Michael Heckmann received approval for a $10,000,000.00 loan for the entity "Basket." (*Id.* at PageID # 606.)

On January 5, 2022, Stanley's agent informed HNB that Michael Heckmann needed to be added to the contract. (ECF No. 50-5, at PageID # 608–09.) The Parties extended the closing date to February 15, but the documents reflect that Michael Heckmann was never added to the contract.

On February 4, Stanley informed HNB that the title to the Property needed to be in his company's name, which is "The Basket, Inc." (ECF No. 50-11, at PageID # 631.) Stanley stated that Michael Heckmann would be the responsible signing party because he is the majority shareholder of The Basket, Inc. (ECF No. 50-12, at PageID # 660.)

B.     **Final Failed Closing**

On the night of February 14—one day before the scheduled closing—Stanley emailed HNB's broker and identified several issues discovered during the final walk-through that day, mostly concerning mold present on the Property. (ECF No. 50-13, at PageID # 669.)

On February 15, 2022, when it became clear the Parties would not close the transaction that day, HNB reiterated to Stanley that it had twice sent mold remediation workers to the property during 2021. (ECF No. 50-13, at PageID # 670.) HNB offered to hold $100,000.00 in escrow with the title company until the Parties could discuss the mold issue and determine whether additional treatment was necessary. (ECF No. 50-13, at PageID # 670.) Near the end of the day

on February 15, Stanley's agent emailed HNB requesting that ServPro—a mold remediation company—examine the mold present on the Property the morning of February 16 and estimate the cost for any removal. (ECF No. 50-14, at PageID # 673.)

Although HNB refused Stanley's request to use ServPro, HNB attempted to remediate the mold by hiring PuroClean—a different mold removal and remediation company—to inspect and remediate two areas of concern in the Property on February 16, 2022, merely one day after the closing deadline. (Affidavit of Nick Shillig, ECF No. 50-15, at PageID # 675.)

When the Parties did not close on February 15, they began a standoff. HNB shared the photos and videos taken by PuroClean's workers during their inspection of the Property but demanded that Stanley provide proof of funds for the sale prior to sharing the mold analysis report. (ECF No. 50-17, at PageID # 713.) HNB said it would be willing to provide an extension for the closing date until Friday, February 18, but that Stanley would have to demonstrate proof of funds. (*Id.*) Stanley told HNB to share the mold report, and that the parties could "go from there." (ECF No. 27-1, at PageID # 213.) Stanley refused to show proof of funds, stating that the contract did not require him to do so. (*Id.* at PageID # 215.)

On February 17, 2022, the transaction devolved further. Stanley emailed counsel for HNB directly stating that Julie Judge—Stanley's real estate broker—would no longer be speaking to counsel for HNB. (ECF No. 50-17, at PageID # 712.) Stanley demanded to have a third-party mold inspector visit the Property, stating that he did not trust any inspector selected by HNB. (*Id.*) Stanley stated that his funds for the purchase were ready to wire on the day of closing, February 15, but that "[s]ince this did not happen, because of the proof of mold remediation, the money was moved back to the lender." (ECF No. 50-17, at PageID # 712–13.) Stanley declares that he had phone conversations with Mr. Ungrady, the TAIC broker, who informed Stanley that TAIC

4

requested confirmation that all of the purchase contract's requirements had been satisfied before releasing the funds to purchase the property. (Stanley Decl., ECF No. 27-1, ¶ 11.) Stanley declares that he disclosed that not all mold had been removed from the Property, and that this disclosure "caused the purchase funds to not be available." (*Id.*) The sole written communication with Mr. Ungrady before the Court is one forwarded email from Mr. Ungrady to Stanley. (ECF No. 27-1, at PageID # 219–22.) This email contains the fines the Saudi Arabia Monetary Authority levied against The Basket, Inc. for not closing on the Property. (*Id.*)

On February 22, 2022, HNB received the mold analysis report from PuroClean. The analysis found that of the 21 samples taken from the building, only two areas had "elevated" levels of the mold aspergillus/penicillium, which the report describes as "the most common of indoor molds." (Schillig Aff., ECF No. 50-15, at PageID # 675–77.) The report stated that these molds "do not pose a serious health concern for healthy individuals without existing respiratory concerns in the observed quantities," and that "[t]he areas affected are small in relation to the entirety of the building envelope." (*Id.*) Shillig—the Development Manager and Project Manager at PuroClean—attests that the areas of mold were remediated by vacuuming, applying mold removal products to remediate the areas, and utilizing air filtration devices to remove any potential air spores. (Shillig Aff., ECF No. 50-15, at PageID # 676.) The cost for this remediation and lab sampling amounted to $12,000.00. (*Id.*) Because Stanley had not provided HNB with proof of funds to purchase the Property, HNB did not share the PuroClean report with Stanley. (*See* ECF No. 27-1, at PageID # 213–16.)

On February 24, Stanley informed his real estate agent that his final offer before pursuing litigation against HNB would (1) require HNB to pay the nearly $45,000.00 fine against The Basket, Inc. levied by the Saudi Arabia Monetary Authority; (2) permit Stanley to send a certified

mold professional to assess the extent of the mold; and (3) if the mold professional determined that mold removal would cost $100,000.00 or less, then the Parties could close on the Property. (ECF No. 27-1, at PageID # 219.) HNB did not accept Stanley's "final offer," Stanley did not purchase the Property, and this litigation ensued.

**II.      Procedural Background**

On December 8, 2023, this Court issued an Order granting Plaintiff Bryan Stanley's Partial Motion for Summary Judgment. (Order, ECF No. 33.) In that Order, the Court granted partial summary judgment in favor of Stanley's breach of contract claim regarding the elements of contract, HNB's breach, and Stanley's performance. (*Id.*) The Court held that Stanley was excused from performance because HNB's breach was material. (*Id.*) The Court rested its decision on HNB causing Stanley's investor to pull out of the transaction due to mold and refusing to permit Stanley's mold remediation expert to examine the Property. (*Id.*) The Court did not have before it several of the communications and documents now offered by HNB.

HNB moves for reconsideration of the Court's decision to grant Stanley summary judgment on the element of Stanley's performance, arguing that whether HNB breach was material must be decided by a jury. (HNB Mot., ECF No. 35, at PageID # 329.) Stanley filed a response in opposition to HNB's Motion (Stanley Resp., ECF No. 38), and HNB replied (HNB Reply, ECF No. 39).

Upon reviewing the Parties' briefing on HNB's motion for reconsideration, the Court was concerned that the prior opinion and order did not reflect all facts necessary to determine whether the breach was material. Accordingly, the Court ordered supplemental briefing on the issue of the extent of mold on the Property and its materiality on the failed transaction. (ECF No. 45.) Both Stanley and HNB filed supplemental briefs and responses. (ECF Nos. 48, 50, 51, 52.)

HNB's Motion is now ripe for the Court's review.

## STANDARD OF REVIEW

A district court has "inherent power to reconsider interlocutory orders," and "may modify, or even rescind, such interlocutory orders." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 945 (6th Cir. 2004). In the Sixth Circuit, courts grant motions for reconsideration where there is "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009). Moreover, to discourage the filing of endless motions for reconsideration and in the interest of "grant[ing] some measure of finality even to interlocutory orders . . . courts should grant motions for reconsideration sparingly" and "only if the prior decision appears clearly to be legally or factually erroneous." *King Lincoln Bronzeville Neighborhood Ass'n v. Blackwell*, No. 2:06-cv-0745, 2009 U.S. Dist. LEXIS 120011, at *4 (S.D. Ohio Dec. 22, 2009). Such motions are "not intended to re-litigate issues previously considered by the Court or to present evidence that could have been raised earlier." *Brunner*, 652 F. Supp. 2d at 877. "This standard obviously vests significant discretion in district courts." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959, n. 7 (6th Cir. 2004)

Here, HNB seeks reconsideration of this Court's summary judgment ruling. "[T]o preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor." *Mike Albert, Ltd. v. 540 Auto Repair, Inc.*, No. 1:21-CV-286, 2024 WL 1174425, at *7 (S.D. Ohio Mar. 19, 2024) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 933 F. Supp. 2d 974, 990 (S.D. Ohio 2013) (citing *Anderson*,

7

477 U.S. at 248). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## ANALYSIS

HNB argues that reconsideration is warranted "to correct a clear error as to the factual determination that Stanley's performance under the Agreement was excused by HNB materially breaching the Agreement." (HNB Mot., ECF No. 35, at PageID # 329.) The Court notes that HNB came perilously close to not challenging the facts presented in Stanley's motion for summary judgment. (*See* HNB Resp., ECF No. 29 (disputing whether HNB breached the contract at all, rather than challenging the materiality of any breach).) HNB's supplemental brief totals 164 pages, including 18 exhibits. (HNB Suppl. Br., ECF No. 50.) To be sure, as Stanley argues, HNB could and should have made their arguments and submitted their exhibits earlier, during the summary judgment briefing stage. (Stanley Resp., ECF No. 38, at PageID # 340–41; ECF No. 52, at PageID # 726.) However, to avoid manifest injustice, the Court uses its discretion to consider them now.

As this Court explained in its Order on summary judgment, Ohio courts consider five factors to determine the materiality of a breach:

1) The extent to which the injured party will be deprived of the benefit which he reasonably expected;

2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

8

4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Rst.2d of Contracts § 241; *Rhodes v. Rhodes Indust., Inc.*, 595 N.E.2d 441, 447 (Ohio App. 3d Dist. 1991). As HNB correctly notes, this factor-based determination is "generally a question of fact." *O'Brien v. Ohio State Univ.*, 2007 Ohio 4833, ¶ 11 (Ohio App. 10th Dist. 2007); *Data Processing Scis. Corp. v. Lumenate Techs., LP*, No. 1:14-CV-740, 2016 WL 2853567, at *3 (S.D. Ohio May 16, 2016) ("The reasoning behind this principle is that to determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith…All of these inquires turn on subjective facts.").

In its Order on summary judgment, this Court found that HNB's failure to remove mold deprived Stanley of his expected benefit of purchasing the Property, and that HNB did not intend to remove all mold or permit Stanley's expert to examine the Property. (Order, ECF No. 33.)

HNB argues that this Court should reconsider its summary judgment order because genuine issues of material fact exist regarding the extent to which the mold deprived Stanley of closing on the Property, whether Stanley could be adequately compensated for the failed transaction, whether HNB's remediation of mold cured its breach under the circumstances, and whether HNB acted with good faith. (HNB Suppl. Br., ECF No. 50, at PageID # 573.) Stanley urges this Court to deny HNB's Motion for Reconsideration, characterizing it as an impermissible attempt to argue matters it could have raised during summary judgment briefing but chose not to. (Stanley Resp., ECF No. 38, at PageID # 340–41 ("HNB already had the opportunity to make its arguments, and

9

its current request is a summary judgment opposition disguised as a motion for reconsideration.").) After reviewing HNB's motion for reconsideration and the parties' supplemental briefing regarding the same, the Court determines it must revisit its decision regarding whether HNB's breach was material.

Here, the two relevant factors to determining materiality of HNB's breach are (I) the extent to which the presence of mold caused Stanley's investor to back out of the deal; and (II) whether HNB acted in good faith. Because factual issues remain regarding each of these pertinent factors, the Court **VACATES** its prior Order regarding whether HNB materially breached the contract.

I. **Extent to Which Stanley was Deprived of a Reasonably Expected Benefit**

In this Court's January 5, 2024 Order Directing Supplemental Briefing, the Court ordered the parties to address the extent of mold on the Property and is materiality on the transaction. (ECF No. 45.) This is because the Court must consider the extent to which Stanley was deprived of a reasonably expected benefit, namely purchasing the Property.

In his Supplemental Brief regarding materiality, Stanley argues that HNB's breach—failing to remove all mold before closing—was material because the breach caused the sale to fall through. (Stanley Suppl. Br., ECF No. 48, at PageID # 387.) Specifically, Stanley states that "HNB made its breach material when it refused to extend the contract to allow Stanley to determine the extent of remediation necessary and try to salvage the closing." (*Id.* at PageID # 388.) As Stanley argues, materiality does not depend on how badly a party breached the term at issue. Rather, materiality depends on how the breach impacted the transaction overall. Thus, Stanley's argument follows, *any* mold which caused the investor to back out from the transaction would make HNB's breach material. The downstream effect of the mold determines the materiality of HNB's breach—not the extent of the mold on the property.

10

Even if the Court accepts Stanley's argument, there is scant evidence involving the presence of mold on the Property and its effect on the transaction. The Court merely has Stanley's declaration regarding his own statements to Mr. Ungrady, who Stanley declares had spoken with TAIC regarding the presence of mold. Stanley declares he had phone conversations with Mr. Ungrady, who told him that "the funds were ready but the investor requested confirmation that all of the requirements in the purchase contract had been satisfied." (Stanley Decl., ECF No. 27-1, at PageID # 184.) Stanley declares that he "made the truthful disclosure to the broker that all mold had not been removed from the building." (*Id.*) According to Stanley, this disclosure "caused the purchase funds to not be available." (*Id.*)

What is *not* before the Court reveals that factual issues persist. For example, the Court does not have *any* evidence of communications between Mr. Ungrady and TAIC regarding the presence of mold. The parties have offered one email demonstrating that the Saudia Arabia Monetary Authority fined TAIC for the failed transaction involving The Basket, Inc. However, that one email says nothing about the presence of mold. That email demonstrates that TAIC was fined for the "The Basket, Inc." transaction, and nothing more. The Court has no testimony—via affidavit, deposition, or otherwise—from Mr. Ungrady or any employee of TAIC. It merely has Stanley's declaration recounting what *he* said to Mr. Ungrady, and implies what Mr. Ungrady said to him, which purportedly recounts what TAIC said to Mr. Ungrady. Nowhere does Stanley declare that he directly communicated with TAIC, or that he was ever a party to communications between Mr. Ungrady and TAIC.

Additionally, who was financing the deal appeared to change multiple times. Stanley attested that he *initially* worked with Quickline Capital Partners, Inc. (Stanley Decl. ¶ 7.) When Quickline decided not to finance the deal, Stanley attests to promptly engaging a second investor—

The Arab Investment Company—through Ohio-based broker Thomas Ungrady. (*Id.* ¶ 8.) Stanley attests that communications with TAIC were through Mr. Ungrady, and that TAIC pre-approved Stanley's financing in November 2021. (*Id.*)

HNB's newly submitted documents, however, show that the investor changed more times than Stanley declared.  The financing documents and communications between the parties demonstrate that Stanley initially worked with TAIC and obtained approval in November 2021, but then TAIC opted out of the deal when the parties could not close and Mr. Ungrady was in the hospital.  Michael Heckmann then received loan approval from Quickline on December 31, 2021.  Then, sometime between December 31, 2021, and the closing date of February 15, 2021, the investor changed back to TAIC.

Thus, considering the new evidence before the court and viewing it in the light most favorable to HNB as the party who opposed summary judgment, factual issues remain regarding whether Stanley reasonably expected to obtain the Property.  The financing of this deal was shaky at times, as demonstrated by the several extensions and repeated change of investors.  The minimal evidence reflects that the record before the Court is simply too thin to determine that the first materiality factor—the extent to which the injured party will be deprived of the benefit which he reasonably expected—weighs in favor of Stanley at the summary judgment stage.

**II.      Whether HNB acted in Good Faith**

Ohio courts have recognized that determining whether a party to a contract acted in good faith is an inherently fact dependent task.  *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 933 F. Supp. 2d 974, 1005 (S.D. Ohio 2013) (citing *O'Brien*, 2007 WL 2729077, at *3).

HNB argues that the mold discovery on the eve of closing was not a material breach because the mold was promptly remediated by a certified mold professional.  (HNB Suppl. Br.,

12

ECF No. 50, at PageID # 579.) Stanley counters that HNB did not act in good faith because, despite hiring PuroClean, HNB refused to share the report with Stanley and refused to permit Stanley to send his own mold removal specialist to the Property. (ECF No. 52, at PageID # 730, 733.)

The Court finds that these facts demonstrate that jurors could find competing inferences and come to different, reasonable conclusions on good faith. Whereas the Court previously knew of HNB's 2021 efforts to remediate mold, the Court was unaware of the PuroClean report, that HNB had hired PuroClean just one day after the scheduled closing, and that HNB paid to remediate the mold based on PuroClean's analysis. Quickly hiring a mold removal company to analyze and remediate the mold may demonstrate good faith, in favor of finding a non-material breach. However, refusing to share the report with Stanley and prohibiting him from examining the property may demonstrate the absence of good faith, in favor of finding a material breach. Weighing these facts and determining whether HNB acted in good faith is within the province of a jury, not this Court.

### III. Joinder of Parties and Diversity Jurisdiction

HNB mentions, in passing, that Stanley "has failed to join necessary and/or indispensable parties to this litigation." (HNB Reply, ECF No. 39, at PageID # 347 (citing HNB's Answer, ECF No. 5, at PageID # 35).) HNB has never moved to join any indispensable party, nor has it identified who, precisely, the indispensable party is. Presumably, HNB considers "The Basket, Inc." and/or Stanley's business partner, Michael Heckmann, as the indispensable parties.

The documents submitted by HNB show that Stanley sought to add Heckmann to the contract (ECF No. 50-5, at PageID # 608–09), and that Stanley intended title to the Property to be in The Basket, Inc.'s name (ECF No. 50-11, at PageID # 631). Moreover, TAIC approved The

13

Basket, Inc. for financing, and not Stanley individually. (ECF No. 50-1, at PageID # 582.) Neither Heckmann nor The Basket, Inc. were ever added as parties to the Contract.

Adding Heckmann or The Basket, Inc. to this case may divest this Court of subject matter jurisdiction. This case is before the Court on diversity jurisdiction. (Compl., ECF No. 1, ¶ 7.) The Basket, Inc. is an Ohio corporation, and Michael Heckmann appears to be an Ohio resident. (*See* ECF No. 50-10, at PageID # 626.) Historic Newark Basket, LLC, is an Ohio resident because its two members reside in and are citizens of Ohio. (Compl. ¶ 6.)

Accordingly, within five days from the date of this order, HNB is **ORDERED** to file a brief explaining who the necessary and/or indispensable parties are and why they are necessary and/or indispensable. Within five days from the filing date of HNB's brief, Stanley is **ORDERED** to file a response brief addressing the same. Each of the parties' briefs are not to exceed five pages.

\* \* \* \* \*

The Court underscores the abnormality of this Order. The extensive evidence submitted by HNB in its supplemental brief on its motion for reconsideration demonstrates that genuine issues of material fact remain. That this evidence is before the Court for the first time on HNB's supplemental brief in support of its motion for reconsideration is unusual, as all such evidence could—and should—have been submitted during the parties' briefing on summary judgment. But, in the interest of preventing manifest injustice, the Court will not elevate procedure over substance. Upon reviewing the briefing by the Parties, deciding whether HNB's actions deprived Stanley of the benefit he reasonably expected by causing his investor to pull back funds, as well as whether HNB acted in good faith, is for a jury, not this Court.

Accordingly, the remaining issues for trial are whether HNB's breach was material and the amount of damages, if any, which Stanley is entitled to. 1 OJI CV 501.33 (2024) ("[A] plaintiff

14

is entitled to damages in the amount sufficient to place him [] in the same position in which he [] would have been if the contract had been fully performed by the defendant if the damages are reasonably certain and reasonably foreseeable."); 80 Ohio Jur. 3d Real Property Sales and Exchanges § 203 ("*Where the evidence showed that at the time a purchaser demanded a deed it was unable to pay* and did not offer to pay, the purchaser has no right to recover damages for breach of contract.") (emphasis added) (citing *Rogers v. Simpson*, 21 Ohio C.D. 103, 1908 WL 524 (Ohio Cir. Ct. 1908)).

## CONCLUSION

For the reasons stated herein, the Court **GRANTS** HNB's Motion for Reconsideration (ECF No. 35). The Court **VACATES** the portion of its Order on summary judgment finding that HNB materially breached the contract, and now finds that Stanley is not entitled to summary judgment on the element of material breach. The remaining issues for trial are the elements of material breach and damages for Stanley's breach of contract claim.

Within five days from the date of this order, HNB is **ORDERED** to file a brief explaining who the necessary and/or indispensable parties are and why they are necessary and/or indispensable. Within five days from the filing date of HNB's brief, Stanley is **ORDERED** to file a response brief addressing the same. Each of the parties' briefs are not to exceed five pages.

Because Stanley informed the Court that his Motion to Continue Trial Date is moot (ECF No. 54), the Court **DENIES as moot** Stanley's Motion (ECF No. 47).

This case remains open.

**IT IS SO ORDERED.**

**5/6/2024**                                          **s/Edmund A. Sargus, Jr.**
**DATE**                                               **EDMUND A. SARGUS, JR.**
                                                                  **UNITED STATES DISTRICT JUDGE**